**RAYDURE v. LINDLEY et al.**

(Circuit Court of Appeals, Sixth Circuit. November 3, 1920.)

No. 3389.

1. **Appeal and error ⬦1096(3), 1199—Injunction in decree cannot, after affirmance, be changed by trial court, nor its correctness reviewed on second appeal.**

In suit by senior against junior oil lessee, the final decree, enjoining defendant, who had placed on the premises oil-drilling machinery, tanks, etc., after complaint had been filed, from doing any work on the land, except what was "necessary for the removal of machinery, equipment, and material placed by him thereon which has not been set up or placed upon said lease for use in operating it," was an injunction against the removal of any equipment or material placed by defendant thereon which had been set up or placed for use in operation, and, the effect of affirmance being to affirm the decree in all its parts, it was not thereafter within the power of the trial court to vacate or modify this injunction in further proceedings in the same cause and based upon substantially the same foundation, such as a so-called amended and supplemental answer and cross-bill; nor would the appellate court upon second appeal be justified in considering as still open on such appeal the correctness of such injunction, the point, although necessarily involved in the first appeal, having been waived by failure then to present it, and being necessarily covered by the first affirmance.

2. **Mines and minerals ⬦80—Junior oil lessee held not entitled to compensation for drilling, etc.**

Notwithstanding Ky. St. § 3728, allowing compensation for improvements made in good faith by defeated occupant, in action by senior against junior lessee of Kentucky oil lands, the defeated junior lessee would not be awarded compensation for drilling done after he forcibly took possession, where, because of evidence that, on account of the controversy and the junior lessee's possession, the senior lessee had lost a sale and thereby a then realizable profit many times the cost of drilling the wells, it was not clear that any net benefit to the senior lessee resulted from the junior lessee's entire course of conduct, of which the drilling formed only one part, and all of which was to be considered in determining the question of benefit.

Appeal from the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Suit by John W. Lindley and others against Winfield S. Raydure. From a decree denying defendant relief on an amended and supplemental answer and cross-bill, filed after affirmance of final decree for plaintiffs, defendant appeals. Affirmed.

Ed. C. O'Rear, of Frankfort, Ky. (W. G. Dearing, of Frankfort, Ky., on the brief), for appellant.

A. R. Burnam, Jr., of Richmond, Ky., for appellees.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

---

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

DENISON, Circuit Judge. This is the second time this case has been in this court. It involves the conflicting claims of two oil leases covering the same property. The lessee under the junior lease obtained possession. The other lessee, the one under the senior or bottom lease, brought this suit, which was essentially an action of ejectment, although brought upon the equity side of the court in analogy to the Kentucky practice. Upon the former appeal, reported in 249 Fed. 675, 161 C. C. A. 585, we held that the bottom lease was good, and affirmed the decree by which Raydure had been directed to turn the property over to Lindley. Raydure then filed in the court below a pleading which he called an amended and supplemental answer and cross-bill, in which he asked that he be permitted to remove those items of personalty which he had put upon the property and which were removable, and that he have compensation for his expenses put upon the property in drilling wells, which wells were said to increase the vendible value of the lease by at least as much as they cost. The District Court denied any of this relief to Raydure, and he appeals.

[1] His claim to relief has reference to three classes of items: The first consists of those appliances put upon the surface of the ground and only temporarily and perhaps indirectly attached. Of this class, the wooden tanks standing upon the surface of the ground and not connected thereto, except by piping, may be taken as typical. The second class consists of items more directly attached, but capable of removal without serious injury to the realty. The well casings and the well tubing are both of this class, although they differ in the degree of the facility in which they can be harmlessly removed. The third class consists of the items of expenditure which are represented only by the supposedly improved condition of the leasehold in permanent respects—as the cost of drilling wells.

The first two classes, for the purpose of this opinion, may be considered together. Under the terms of both top and bottom leases, and by prevailing customs, he had the right as against the lessor to remove all these items; as to some, absolutely, and as to some, with conditions. The theory under which they were held to have passed from the ownership of the lessee who installed them to that of the lessee whose title prevailed is that they had become united to and merged in the leasehold or the operation, and so had lost the character of separable personalty. We do not have occasion to pass upon Raydure's challenge of this theory, because, for the support of this part of the decree below, there is another reason, ample in itself.

In the original case, Lindley's complaint prayed an injunction to prevent Raydure from going upon the premises for the purpose of drilling or removing oil or gas, and from obstructing Lindley in his production of oil and gas therefrom, and also prayed a decree that Lindley be adjudged the exclusive owner of the rights in controversy. This complaint was filed before Raydure had put upon the property any of the items now in dispute. Raydure, by his answer

and cross-bill, claimed to be the lawful owner of the rights in question, and that he had the exclusive right at all times to enter said premises for the purpose of drilling, and the exclusive right "to erect, maintain, operate and remove all buildings, * * * structures, pipe lines, machinery * \ * * . erected upon or placed on said land by him," and he prayed that his title and possession be quieted. This litigation occupied about a year, during which period Raydure installed the items and incurred the expenses now involved. By the final decree in the case, it was adjudged that Raydure and his employees be perpetually enjoined from—

"extracting any oil or gas or doing any work upon the lands hereinafter described, other than such as may be necessary for the removal of the machinery, equipment and material placed by him thereon which has not been set up or placed upon said lease for use in operating it."

This was plainly an injunction against the removal of any equipment or material placed by Raydure on the land, which had been set up or placed for use in operation, and the injunction, therefore, reached and covered both the first two classes of items above specified. It was the apparent theory of the decree, as it is of the later order now appealed from, and by analogy to the rights of conflicting claimants in the realty, that any equipment which had been set up or placed for use in operation had become attached to, and merged in, the leasehold interest, and should go along with it to the successful contestant, because it had become a part of the same unit. Not only is this the certain meaning of the decree, but Raydure did not overlook or misunderstand the effect of the decree in this particular. One of his assignments of error upon the former appeal challenged the injunction restraining him from "removing or in any manner interfering with the machinery or appliances used in drilling for, extracting or storing oil or gas"—though this assignment was not specifically urged in this court. The effect of the decree in this court was to affirm the decree below in all its parts, and it was not thereafter within the power of the trial court to vacate or modify this injunction in further proceedings in the same cause and based upon substantially the same foundation. Bissell Co. v. Goshen Co. (C. C. A. 6) 72 Fed. 545, 19 C. C. A. 25; Eastern Cherokees v. U. S., 225 U. S. 572, 582, 32 Sup. Ct. 707, 56 L. Ed. 1212.

It is sought to avoid this situation because a later paragraph of the decree appointed a receiver to hold and operate the property pending the appeal, and provided that Raydure pending the appeal—

"shall not remove any machinery, equipment, or material from the above described leases during the pendency of such appeal, which may be necessary to such receiver in carrying out the order of his appointment."

It is suggested, rather than urged, that this paragraph made the earlier and absolute injunction contingent upon the further order of the court eventually to be made in the receivership matter. If the two paragraphs were inconsistent, there might be room for this claim; but there is no inconsistency. The decree as a whole recognizes that the equipment and materials, brought upon the premises

by Raydure, were at that time of two classes: That which had been placed for use in operation, and that which had not been so placed. The earlier and general injunctional provision did not prevent Raydure from removing the latter class of items. The later paragraph provided that he must not remove even these, if the receiver should need them for his temporary use.

We do not overlook that, as we have construed the decision of the Supreme Court in Messinger v. Anderson, 225 U. S. 436, 32 Sup. Ct. 739, 56 L. Ed. 1152 (see Chesapeake Co. v. McKell, 209 Fed. 514, 516, 126 C. C. A. 336), the appellate court upon a second appeal is not so absolutely bound by its first decision as the law of the case as the trial court would be; but this would not justify us in considering as open on the second appeal a point which, though necessarily involved upon the first appeal, had been waived by the failure to present it, and which had necessarily been covered by the former decree of affirmance.

[2] From these considerations, it follows that, in so far as the decree now under consideration confirms Lindley et al. in the undisturbed possession and use of the class of property of which the surface tanks are typical, it must be affirmed. The claim for the cost of drilling wells, as an improvement added to the value of the property, stands upon a different basis, since it is not necessarily concluded by the former decree, and is made by analogy to the claim of the defeated contestant as to a real estate title, which is often first formulated after the main controversy is decided. This claim may well include the second class of items above named, which are quasi permanent in their attachment. It might even reach to the first class of items specified, since upon the theory that these items had become merged in the leasehold interest their analogy to improvements upon the real estate becomes close; but, in view of the result we reach, it is not important to what items the claim and its theory reach.

There is a statute in Kentucky (section 3728, Carroll's Kentucky Statutes) which provides that—

"If any person, believing himself to be the owner, by reason of any claim in law or equity, the foundation of which being a public record, hath or shall hereafter peaceably seat and improve any land, but which land shall, upon judicial investigation, be decided to belong to another, the value of the improvements shall be paid by the successful party to the occupant," etc.

Manifestly this statute does not literally apply to the lessee's operations under an oil lease and to a contest between the conflicting lessees; but the underlying principle is so far one of equity, independent of statute, and applied by equity courts generally, that a consideration of the equitable principles applied as between contesting land owners is not inappropriate. Under such language as that found in this statute, and under the general equitable principles involved, it has come to be understood that the good faith of the occupant in making his improvements is the criterion of his right to be reimbursed, and whether Raydure should be deemed

to have proceeded "in good faith" is the question which has been chiefly argued; indeed, the court below rested its conclusion largely on the "high-handed" character of Raydure's action.

Leases for two parcels are here involved; in each case, Raydure had personal knowledge of the existence of the earlier lease when he took his; as to one parcel, Lindley was first to occupy by placing drilling machinery thereon, and Raydure forcibly took possession in that he moved this machinery off the property, in the absence of Lindley or any one representing him; as to the other parcel, Raydure took possession first, and maintained it with a show of force, when immediately thereafter Lindley undertook to enter. Lindley commenced this suit very promptly, and, at its commencement, Raydure had not, upon either parcel, done any part of the drilling or attached any of the property for which he now claims compensation. These items all developed after the suit was begun and before the original decree, and rested upon the possession thus taken or maintained. These matters militate against Raydure's good faith, as that term has been defined in this connection.

On the other hand, before he had incurred much, if any, of the expense now involved, Raydure consulted three reputable and competent counsel, by each of whom he was advised that, as matter of law, his title was good, because the Lindley leases were unilateral and void. It is not denied that the decisions of the Kentucky courts up to that time furnished at least plausible support for this theory and were not to the contrary, and the opinion of the court below and of this court on the former hearings demonstrate that the question was, or at least at the time of commencing suit had been, close and difficult. It also appears that an oil lease is perishable property, and for the preservation of its value may require immediate development—differing in this respect from ordinary real estate—and also that Raydure tried, but failed, to get Lindley's consent to the appointment of a receiver at or near the beginning of the suit. Under these circumstances, Raydure forcibly protests that a court of equity ought not to treat him as a fraudulent or bad faith claimant.

The latest and most pertinent decision of the Kentucky Court of Appeals is found in Loeb v. Conley, 160 Ky. 91, 169 S. W. 575, Ann. Cas. 1916B, 49. This was a case between two oil leases. The junior lessee had been in possession and had drilled wells, but the senior had prevailed in the litigation. Compensation to the junior was denied. The Kentucky cases are reviewed, and the case is decided on its own facts. It would seem that the thing in controversy was whether, as matter of fact, the prior lease included the property covered by the other one, and it is held, in substance, that whatever the junior lessee expended on the property, after he had knowledge of the prior lease which was claimed to cover the property, he did subject to the chance that he would lose it if the fact was as claimed. Indeed, it does not appear by the reported opinion that the junior lessee had any fair reason for believing that the earlier lease did not cover the property. While announcing the general rule that whatever is done by the occupant after notice of

the adverse title is done at his peril, yet perhaps the gist of the opinion is found in the statement:

"Under these circumstances, we think that the Loebs (the junior lessees) did not make these improvements in good faith belief that they had the right to make them, and so are not entitled to compensation"

—and in the further statement that, when the improvements are made after actual notice "of a recorded instrument that shows on its face the superior ownership of the adverse claimant, there is no ground left on which to rest the belief of good faith."

It is not difficult to distinguish the Loeb Case from the present one. We are not prepared to say that Raydure did not believe that he had the right to drill the wells; and the earlier lease to Lindley, instead of "showing on its face the superior ownership of the adverse claimant," showed the contrary, providing the advice of Raydure's counsel was good law.

In Guffey v. Smith, 237 U. S. 101, 118, 35 Sup. Ct. 526, 59 L. Ed. 856, we find facts in some respects very similar. There was a contest between two oil leases, and the junior had been in possession, and the senior was contested, because it was claimed to be invalid through the presence of a surrender clause. The Supreme Court says that after the junior lessee had actual notice of the existence of the earlier lease and the intention of the lessee therein to insist upon his rights, what was done thereafter "cannot be regarded as anything less than a willful taking and appropriation of the oil which was subject to complainant's superior right." It is not easy to avoid the controlling effect of this decision as applied to the present case; yet perhaps it can be distinguished. That opinion had already stated that the existence of an "honest though mistaken belief" that the defendants had a right to the oil was the controlling thing; and no such advice of counsel justifying that belief, as is found here, appears in the Guffey-Smith Case (though it might very probably have existed). Perhaps more important by way of distinction is the fact that the right of an occupying defendant to recover for permanent improvements was not directly involved and that the analogy thereto was not noticed or considered. The defendants during their possession had taken out and sold a large amount of oil; they were being required to account for it, and they sought to set off against the price they had received their cost of production. The cases cited by the Supreme Court (237 U. S. 119, 35 Sup. Ct. 532, 59 L. Ed. 856)[1] show that it had in mind the rule that one who has removed timber, minerals, etc., from the real estate without the consent of the true owner will be charged with the ultimate manufactured value in the form in which he sold them, if he was a willful trespasser, but only with the raw value, if he was ignorant of the true title. It did not appear that these im-

---

[1] Indeed, one of these cases, U. S. v. St. Anthony, 192 U. S. 524, 542, 24 Sup. Ct. 333, 48 L. Ed. 548, is the strongest case we have seen to the effect that one who relies upon mistaken counsel in matter of law, though he knows all the facts, may still have the status of "good faith."

provements added to the value of the property turned back to Guffey; indeed, it is obvious that they did not add to the original value, because they were only presented as being in mitigation of waste. The considerations affecting a case of permanent improvements adding to permanent value are not necessarily the same in all respects as where the matter is one of accounting for a trespass.

Whether or not the rule of Guffey v. Smith should be considered as applicable to the facts here existing, there is another reason for upholding the decree. An oil lease is perishable property; its entire value may be lost by neighboring operations unless it is, worked; its management is a business enterprise calling for a high degree of skilled judgment, and even with such judgment it remains largely speculative from beginning to end. It may be best to drill this year or not to drill, to put down 5 wells or 50, to pump or not to do so, to operate or to sell. The true owner is entitled to exercise his own judgment in all these things. He ought not to be compelled to submit to somebody else's, even though it may turn out to be better than his. Where the owner is excluded from occupation and management for a year, during the early stages of development of the field, while the location of pipe lines and other matters are being settled, and values are fluctuating violently, it can rarely be said with certainty at the end of the period that the cost of drilling a few wells has been a net benefit to the true owner which equity should require him to repay to the one whose claim turns out to be unfounded.

This record contains evidence tending to show that Lindley, because of the existence of the controversy and Raydure's possession, lost a sale, and thereby lost a then realizable profit many times the cost of drilling these wells. There is evidence, also, claiming that many more wells ought to have been drilled. On the other hand, the price of oil was so constantly increasing that the delay did not hurt anybody; but, in the next case, the price of oil may have fallen. The whole subject is speculative. It is enough to say that upon this record we are not convinced that any net benefit to Lindley resulted from Raydure's entire course of conduct, of which the drilling of the wells forms only one part, but which must all be taken into account in determining any equitable question of benefit.

The decree is affirmed.